IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT BLUEFIELD

DENEICE BRANCH,

Plaintiff,

v. CIVIL ACTION NO. 1:26-00019

ALLERGAN, INC., et al.,

Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the court is a motion to dismiss filed by defendants Allergan, Inc., Allergan USA, Inc., and AbbVie Inc. See ECF No. 11. Also pending is a motion by defendants Covidien LP, Medtronic, Inc., and Medtronic USA, Inc. to join in that motion to dismiss, see ECF No. 17, and that motion is **GRANTED.** For the reasons expressed below, the motion to dismiss is **GRANTED** in part and **DENIED** in part.

I. Background

According to the allegations in the Complaint, which are taken as true at this juncture, on or about July 19, 2009, plaintiff Deneice Branch had a Lap-Band® device implanted at WVU Princeton Community Hospital in Princeton, West Virginia. See Complaint ¶ 1. "The Lap-Band® is a Class III medical device designed as a long-term surgically implantable device intended to induce weight loss in morbidly obese patients by limiting food consumption." Id. at ¶ 12.

In 1993, the Lap-Band® System was introduced in Australia and Europe and was sold by BioEnterics Corporation. See id. at ¶¶ 16, 17. On or about June 5, 2001, the United States Food and Drug Administration ("FDA") approved BioEnterics Corporation's premarket approval application ("PMA") for the Lap-Band® Adjustable Gastric Banding System. See id. at ¶ 17. Defendant Allergan, Inc. acquired the Lap-Band® device on or about March 23, 2006. See id. at ¶ 18. "Allergan, Inc. manufactured, marketed, sold and/or distributed the Lap-Band® device in the United States from 2006 until 2015 or later." Id.

"In or around 2007, Plaintiff saw a television commercial advertising Lap-Band® as a safe, less invasive procedure for weight loss." Id. at ¶ 52. Based upon "representations that the product was safe, easy, [and] less invasive in the commercial advertisement," Branch asked her primary care physician for a referral to a gastroenterologist for a possible Lap-Band® implantation. Id. at ¶ 53. "At no time did either physician tell [Branch] that she may suffer serious injury from use of the Lap-Band®, including erosion and bowel resection." Id. According to plaintiff, "[h]ad she been informed of the potential for these serious complications, she would have reevaluated her options for weight loss and chosen another method." Id.

On July 17, 2009, "[a]fter [Branch] complet[ed] a recommended psychiatric evaluation and nutrition education," a surgeon implanted the Lap-Band® to treat Branch's morbid obesity. See id. at ¶¶ 54, 12. Fifteen years later, in September 2024, plaintiff saw a doctor after experiencing abdominal pain and nausea. See id. at ¶ 56. A CT scan revealed that Branch's Lap-Band® had eroded into her stomach. See id. On February 21, 2025, Branch underwent band removal surgery at Roanoke Memorial Hospital. See id. at ¶ 57. "At the time of Plaintiff's surgery, the Lap-Band® had eroded into Plaintiff's stomach and into a portion of her small bowel, requiring a laparoscopic removal of the Lap-Band®, lysis of extensive adhesions, a small bowel resection and gastric closure." Id. Branch alleges that she continues to suffer from nausea and stomach pain since her Lap-Band® was removed. See id. at ¶ 58.

On January 9, 2026, plaintiff filed the instant complaint against Allergan, Inc., Allergan USA, Inc., AbbVie Inc., Covidien LP, Medtronic, Inc., and Medtronic USA, Inc. According to the Complaint, "Allergan and Allergan USA distributed the Lap-Band® devices during the relevant time periods[.]" Id. at ¶ 4. In May of 2020, defendant AbbVie acquired Allergan and its assets and liabilities, including Lap-Band®. See id. at ¶ 5. Defendant Covidien LP is alleged to have "entered into an

agreement with Allergan, Inc., to co-promote Allergan's Lap-Band® to surgeons in the United States." Id. at ¶ 6. In 2014, the Medtronic defendants, i.e., Medtronic, Inc. and Medtronic USA, Inc., acquired Covidien. See id. at ¶ 7.

The gist of plaintiff's complaint is that "Allergan, Inc., knew that erosion was a significant risk long-term." Id. at ¶ 46. To that end, the complaint refers to a number of studies that allegedly show as much. See id. ¶¶ at 23-48. The studies cited span from 2001 to 2017. See id. Plaintiff maintains that, beginning in 2006, defendants "fraudulently concealed from Plaintiff's Physicians, the medical community and Plaintiff" the true risks associated with the Lap-Band®. Id. at ¶ 49.

Plaintiff asserts the following claims against defendants: Strict Liability – Failure to Warn ("Count One"); Strict Liability – Defective Design ("Count Two"); Negligence ("Count Three"); Gross Negligence ("Count Four"); Violation of the West Virginia Consumer Credit and Protection Act ("Count Five"); Negligent Misrepresentation ("Count Six"); and Punitive Damages ("Count Seven"). Defendants have moved to dismiss plaintiff's complaint for a host of reasons, including express preemption, implied preemption, and failure to state a claim with sufficient factual specificity.

## II. Standard of Review

"'[A] motion to dismiss for failure to state a claim for relief should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim.'" Rogers v. Jefferson-Pilot Life Ins. Co., 883 F.2d 324, 325 (4th Cir. 1989) (quoting Johnson v. Mueller, 415 F.2d 354, 355 (4th Cir. 1969)). "In considering a motion to dismiss, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." Mylan Laboratories, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993); see also Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997)("Regarding dismissal under Rule 12(b)(6), we accept the well-pled allegations of the complaint as true, and we construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff.").

In evaluating the sufficiency of a pleading, the cases of Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), provide guidance. When reviewing a motion to dismiss, under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted, a court must determine whether the factual allegations contained in the complaint "'give the defendant fair notice of

what the . . . claim is and the grounds upon which it rests,'" and, when accepted as true, "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957); see also 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216 (3d ed. 2004) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action."). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 546. As the Fourth Circuit has explained, "to withstand a motion to dismiss, a complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" Painter's Mill Grille, LLC v. Brown, 716 F.3d 342, 350 (4th Cir. 2013) (quoting Twombly, 550 U.S. at 570).

According to Iqbal and the interpretation given it by our appeals court,

> [L]egal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes. See Iqbal, 129 S.Ct. at 1949. We also decline to consider "unwarranted inferences, unreasonable conclusions, or arguments." Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 615 n. 26 (4th Cir. 2009); see also Iqbal, 129 S. Ct. at 1951-52.

> Ultimately, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S.Ct. at 1949 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Facial plausibility is established once the factual content of a complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In other words, the complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiff's claims "'across the line from conceivable to plausible.'" Id. at 1952 (quoting Twombly, 550 U.S. at 570, 127 S.Ct. 1955).
>
> Satisfying this "context-specific" test does not require "detailed factual allegations." Id. at 1949-50 (quotations omitted). The complaint must, however, plead sufficient facts to allow a court, drawing on "judicial experience and common sense," to infer "more than the mere possibility of misconduct." Id. at 1950. Without such "heft," id. at 1947, the plaintiff's claims cannot establish a valid entitlement to relief, as facts that are "merely consistent with a defendant's liability," id. at 1949, fail to nudge claims "across the line from conceivable to plausible." Id. at 1951.

Nemet Chevrolet, LTD v. Consumeraffairs.com, Inc., 591 F.3d 250, 255-56 (4th Cir. 2009); see also Midgal v. Rowe Price-Fleming Int'l, Inc., 248 F.3d 321, 326 (4th Cir. 2001) ("The presence of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support the legal conclusion.") (internal citation and quotation omitted).

## III. Analysis

Although the Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq., had long required Food and Drug Administration ("FDA") approval for the introduction of new drugs into the market, prior to 1976, "the introduction of new medical devices was left largely for the States to supervise as they saw fit." Riegel v. Medtronic, Inc., 552 U.S. 312, 315 (2008); see also Brooks v. Mentor Worldwide LLC, 985 F.3d 1272, 1276 (10th Cir. 2021) ("As is its prerogative, Congress heavily regulates the production and use of medical devices. In doing so, Congress has introduced federal law to an area state law, alone, once governed."). In 1976, Congress passed the Medical Device Amendments ("MDA"), 21 U.S.C. § 360c et seq., which "imposed a regime of detailed federal oversight" for medical devices. Id. at 316.

Under the MDA, medical devices are subject to varying degrees of oversight which are dependent on the risks presented by the device at issue. See id. Class I devices, such as elastic bandages and examination gloves, are subject "to the lowest level of oversight." Id. A Class II device, like powered wheelchairs or surgical drapes, "cannot be classified as a class I device because the general controls by themselves are

insufficient to provide reasonable assurance of the safety of effectiveness of the device." 21 U.S.C. § 360c(a)(1)(B); Riegel, 552 U.S. at 316-17. For this reason, Class II devices are subjected to additional "special controls" such as performance standards and postmarket surveillance. 21 U.S.C. § 360c(a)(1)(B); Riegel, 552 U.S. at 316-17.

Class III devices are subjected to the "most federal oversight." Riegel, 552 U.S. at 317. "In general, a device is assigned to Class III if it cannot be established that a less stringent classification would provide reasonable assurance of safety and effectiveness, and the device is `purported or represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health,' or 'presents a potential unreasonable risk of illness or injury.'" Id. (quoting 21 U.S.C. § 360c(a)(1)(C)(ii)).

Class III devices are required to obtain premarket approval ("PMA") "to provide reasonable assurance of its safety and effectiveness." 21 U.S.C. § 360c(a)(1)(C).

> Premarket approval is a rigorous process. A manufacturer must submit what is typically a multivolume application. It includes, among other things, full reports of all studies and investigations of the device's safety and effectiveness that have been published or should reasonably be known to the

> applicant; a full statement of the device's components, ingredients, and properties and of the principle or principles of operation; a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such device; samples or device components required by the FDA; and a specimen of the proposed labeling. Before deciding whether to approve the application, the agency may refer it to a panel of outside experts, and may request additional data from the manufacturer.
>
> The FDA spends an average of 1,200 hours reviewing each application, and grants premarket approval only if it finds there is a reasonable assurance of the device's safety and effectiveness. The agency must weig[h] any probable benefit to health from the use of the device against any probable risk of injury or illness from such use. It may thus approve devices that present great risks if they nonetheless offer great benefits in light of available alternatives.

Riegel, 552 U.S. at 318 (internal citations and quotations omitted).

The MDA also included an express preemption provision which states as follows:

> Except as provided in subsection (b) of this section, no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement --
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).

In Riegel, the Court considered how the FDCA's express preemption clause impacts medical devices that have received premarket approval. The Riegel court held that "[s]tate requirements are pre-empted under the MDA only to the extent that they are 'different from, or in addition to' the requirements imposed by federal law." Riegel, 522 U.S. at 330 (quoting 21 U.S.C. § 360k(a)(1)). According to the Court, "§ 360k does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case 'parallel,' rather than add to, federal requirements." Id.

Riegel established a two-step procedure for determining if state-law claims are preempted. First, a court must determine whether "the Federal Government has established requirements applicable to" the particular medical device. Id. at 321. With respect to the first step, claims involving a Class III medical device with premarket approval automatically qualify because the PMA process establishes specific requirements applicable to a particular device. See id. at 322-23; see also Walker v. Medtronic, Inc., 670 F.3d 569, 577 (4th Cir. 2012) ("[B]ecause all Class III medical devices are required to undergo the

premarket approval process, federal requirements exist with respect to all Class III devices.”).

As for the second step, a court must determine whether the state law claims are based on requirements “different from or in addition to” the federal requirements relating to safety and effectiveness or any requirement under the MDA. Riegel, 522 U.S. at 323. Riegel held that state common law and statutory duties imposed through litigation are requirements “with respect to devices” as that term is used in Section 360k(a). Id. at 327-28. In so doing, the Court noted that

> [s]tate tort law that requires a manufacturer’s [device] to be safer, but hence less effective, than the model the FDA has approved disrupts the federal scheme no less than state regulatory law to the same effect. Indeed, one would think that tort law, applied by juries under a negligence or strict-liability standard, is less deserving of preservation.

Id. at 325. As to the case before it, the Riegel court held that the plaintiff’s claims for negligence, strict liability, and implied warranty were preempted. See id. at 330.

In addition to the express preemption provision found at § 360k, there is also an implied preemption provision found at 21 U.S.C. § 337. That provision states that all actions to enforce FDA requirements for medical devices “shall be by and in the name of the United States.” 21 U.S.C. § 337(a). Put another

way, "Congress intended that the MDA be enforced exclusively by the Federal Government." Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 352 (2001). Accordingly, the FDCA preempts "any state tort claim that exists 'solely by virtue' of an FDCA violation." Caplinger v. Medtronic, Inc., 784 F.3d 1335, 1339 (10th Cir. 2015) (quoting Buckman, 531 U.S. at 353). "So, even if a plaintiff's claim is not expressly preempted, it is impliedly preempted if it is cognizable only because of duties owed to the FDA." Brooks v. Mentor Worldwide LLC, 985 F3d 1272, 1279 (10th Cir. 2021).

> Along with express preemption, this implied preemption provision leaves only a narrow gap of possible state tort claims. Any such claim must be predicated on conduct that violates the FDCA but may not be brought solely because that conduct violates the FDCA—the conduct must also violate a parallel state-law requirement.
>
> Put differently, to survive preemption, a plaintiff must plead conduct that (1) violated the FDCA (because state law may not impose additional or different duties) and (2) would be actionable under state law independently of the FDCA (because a plaintiff may not seek to enforce the FDCA). See In re Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig., 623 F.3d 1200, 1204 (8th Cir. 2010) (internal citation omitted). And when the pleader misses the gap—that is, when federal law preempts a claim—the court should dismiss the claim.

Id. "[C]rafting a complaint sufficient to satisfy all these demands has been compared to the task of navigating between Scylla and Charybdis." Caplinger, 784 F.3d at 1340.

A. Count One - *Strict Liability Failure to Warn*

Count One is a strict liability failure to warn claim. Citing a variety of federal statutes and regulations, plaintiff contends that all defendants "created and distributed false and misleading advertising, including but not limited to representations and warranties regarding the risks, safety, recovery time, and effectiveness of the Lap-Band® to convince Plaintiff's physicians, the medical community, Plaintiff and other consumers to use the Lap-Band® over other methods of weight loss procedures, and they violated 21 C.F.R. § 814.80 because Lap-Band® Defendants distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it." ECF No. 1 at ¶ 65.

Insofar as plaintiff asserts that defendants were required to give additional and supplemental warnings, her claim is expressly preempted as she seeks to impose a requirement different from, or in addition to the FDA's premarket approval. As the United States Court of Appeals for the Eighth Circuit put it:

> Even if federal law allowed [defendants] to provide additional warnings, as Plaintiff[ ] allege[s], any state law imposing an additional requirement is preempted by § 360k. "Where a federal requirement permits a course of conduct and the state makes it obligatory, the state's requirement is in addition to the federal requirement and thus is preempted."

In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litigation, 623 F.3d 1200, 1205 (8th Cir. 2010) (quoting McMullen v. Medtronic, Inc., 421 F.3d 482, 489 (7th Cir. 2005), cert. denied, 547 U.S. 1003 (2006)).

Plaintiff also alleges that defendants "distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval for it." ECF No. 1 at ¶ 65. According to the Complaint,

> Plaintiff does not allege that Lap-Band® Defendants should have unilaterally changed the label for the device, but that when they marketed and advertised the device to Plaintiff's physicians, the medical community, Plaintiff and other consumers, they were obligated to disclose the rates of Lap-Band® erosion, removal, and failure that they knew, or should have known about, at the times when the device was sold and marketed to Plaintiff's physicians, the medical community, Plaintiff and other consumers.
>
> Defendants also had a parallel state law duty when they advertised and marketed the device to Plaintiff's physicians to exercise reasonable care to provide adequate and accurate warnings to Plaintiff's physicians of unreasonably dangerous conditions of the Lap-Band® device that were known, or knowable, to Lap-Band® Defendants.

Complaint at ¶¶ 66, 67.

Distilled to their essence, plaintiff's allegations are that defendants were required to give additional, stronger warnings, i.e., that the FDA-mandated warnings were insufficient. The court finds such claims expressly preempted because they impose greater warning requirements on defendants

than the FDA requires. If plaintiff's state law failure to warn claims were allowed to proceed to trial, a jury could hold defendants liable for warnings that fully comply with FDA requirements. Imposing such a state law duty, then, would establish requirements "different from, or in addition to" the federal law governing medical devices. See Brooks v. Mentor Worldwide LLC, 985 F.3d 1272, 1280 (10th Cir. 2021) ("Plaintiffs identify no federal requirement that a Class III-device manufacturer provide a warning directly to a patient. . . . Because Plaintiffs have not offered—and we will not seek out—a federal requirement to warn patients, any state-law duty to do so adds to the federal scheme as it is before us. Federal law expressly preempts any such addition.") (internal citation omitted); Caplinger v. Medtronic, Inc., 784 F.3d 1335, 1341 (10th Cir. 2015) (affirming dismissal of failure to warn, negligence, and negligent misrepresentation claims "because the federal regulations [plaintiff] cites govern only a device's labeling and her state law claims go well beyond that, attacking not just Infuse's label but also Medtronic's advertising and oral and written representations to her, her doctor, and others. So as a matter of law, [plaintiff]'s state law claims substantially exceed the potential scope of any federal regulation she's identified."); Cupek v. Medtronic, Inc., 405

F.3d 421, 424 (6th Cir. 2005) (claims alleging that "Defendant[s] failed to warn patients beyond warnings required by the FDA" are preempted); Banet v. Cooper Companies, Inc., Civil Action No. 4:24-cv-029-RGH, 2025 WL 2810675, at *13 (W.D. Ky. Sept. 30, 2025)("To the extent Banet's claims are premised on alleged defects in the marketing or labelling approved by the FDA, or on alleged failures to warn beyond the warnings required by the FDA, Banet's claims are expressly preempted."); Chester v. Boston Scientific Corp., Civil Action No. 16-02421 (FLW), 2017 WL 751424, at *7 (D.N.J. Feb. 27, 2017) ("To find that the [Class III medical] device is unsafe and defective because of the omission of a warning from the FDA-approved label would therefore overturn the FDA's determination and impose a stricter state standard."); Ellis v. Smith & Nephew, Inc., C/A No. 6:15-545-TMC, 2016 WL 7319397, *7 (D.S.C. Feb. 16, 2016) ("[T]o the extent that the complaint alleges a breach of a duty to advise or warn the public and medical community, it creates an additional requirement and is preempted."); Cooley v. Medtronic, Inc., Civil No. 09-30-ART, 2012 WL 1380265, at *3 (E.D. Ky. Apr. 20, 2012) ("The MDA preempts this [failure to warn] claim because success on the claim would require Medtronic to have provided different or additional warnings from those approved by the FDA."); Enlow v. St. Jude Med., Inc., 210 F. Supp.2d 853,

860 (W.D. Ky. 2001) ("[T]o the extent the plaintiff claims the above cited warning or any other FDA approved warnings are inadequate, the claim is preempted.").[1]

Furthermore, plaintiff's failure to warn claim that defendants "distributed, and/or advertised in a manner that is inconsistent with the conditions for approval specified in the PMA approval" is subject to dismissal under Iqbal because it is insufficiently pled. Plaintiff does not point out specific facts to show how defendants' advertising deviated from the PMA approval. Her allegations in this regard are conclusory and subject to dismissal. See, e.g., Merkle v. Medtronic, Inc., Civil Case No. SMG-25-3737, 2026 WL 1361491, *6-7 (D. Md. May 15, 2026) ("Plaintiff specifies that she is not seeking damages for noncompliance with federal reporting or labeling duties. . .

[1] Defendants also argue that plaintiff's failure to warn claims are barred by the learned intermediary doctrine, codified at West Virginia Code § 55-7-30. That statute provides, in relevant part, that "[a] manufacturer or seller of a prescription drug or medical device may not be held liable in a product liability action for a claim based upon inadequate warning or instruction unless the claimant proves among other elements, that: (1) The manufacturer or seller of a prescription drug or medical device acted unreasonably in failing to provide reasonable instructions or warnings regarding foreseeable risks of harm to prescribing or other health care providers who are in a position to reduce the risks of harm in accordance with the instructions or warnings; and (2) Failure to provide reasonable instructions or warnings was a proximate cause of harm." Branch has adequately pled her claim such that the learned intermediary doctrine would not bar it at this stage of the proceedings.

. But she fails to recognize that she has to identify a fact-based violation of the FDA's requirements to sustain her claims against a preemption challenge. Her allegation that the approved labelling and manuals constitute a misleading net impression, . . . is, inherently, a challenge to the FDA's approved labeling requirements. She must provide a clearer picture of other statements made by Medtronic at other times and the ways in which these statements differed from the FDA-approved requirements. . . . In her Complaint, Plaintiff has not alleged sufficient facts to suggest that any of Medtronic's labeling violated the federal requirements that the FDA put in place for the DBS device.").

B. Count Two – *Strict Liability Defective Design*

Count Two of plaintiff's complaint, "Strict Liability-Defective Design," challenges the safety and effectiveness of the Lap-Band®'s FDA-approved design. According to plaintiff:

> 88. The Lap-Band® device is defective and unreasonably dangerous to consumers, as the utility of the Lap-Band® device does not outweigh the dangers of high rates of serious adverse events, including band erosion, re-operation rates, and band removal and failure risks.
>
> 89. The Lap-Band® device is defective in its design, as it is not reasonably fit, suitable or safe for its intended purpose and its foreseeable risks exceed the benefits association with its design.
>
> * * *

> 94. At all times pertinent, there were practical and feasible alternative designs that would have prevented and/or significantly reduced the risk of Plaintiff's injuries without impairing the reasonably anticipated or intended function of the Lap-Band® device. These safer alternative designs were economically and technologically feasible and would have prevented or significantly reduced the risk of Plaintiff's injuries without substantially impairing the Lap-Band® device's utility.

ECF No. 1 at ¶¶ 88, 89, and 94.

"In West Virginia, 'the general test for establishing strict liability in tort is whether the involved product is defective in the sense that it is not reasonably safe for its intended use.'" Brumfield v. Medtronic, Inc., CIVIL ACTION NO. 3:20-0522, 2021 WL 933869, at *4 (S.D.W. Va. Mar. 11, 2021) (quoting Syl. Pt. 4, Morningstar v. Black and Decker Mfg. Co., 253 S.E.2d 666 (W. Va. 1979)) (Chambers, J.). Under West Virginia law, "a defective product may fall into three broad, and not mutually exclusive categories: design defectiveness; structural defectiveness; and use defectiveness arising out of the lack of, or the inadequacy of, warnings, instructions and labels." Morningstar v. Black & Decker Mfg. Co., 253 S.E.2d 666, 683 (W. Va. 1979). "The general test for establishing strict liability in tort is whether the involved product is defective in the sense that it is not reasonably safe for its intended use." Id.; see also Campbell v. Boston Scientific Corp., 882 F.3d 70, 79 (4th Cir. 2018) (quoting Morningstar).

Branch’s design defect claim is expressly preempted under Riegel because she seeks to impose different or additional requirements than those imposed by the FDA. Under West Virginia law, “a plaintiff asserting a strict liability claim for a design defect must prove that an alternative, feasible design was available to the manufacturer at the time the product in question was manufactured[.]” Shears v. Ethicon, 902 S.E.2d 775, 785 (W. Va. 2024). In other words, Branch would need to prove that defendants should have used an alternative design, i.e., a design different from that approved by the FDA through the PMA process. As the Court in Riegel put it, “[s]tate tort law that requires a manufacturer’s [Class III medical device] to be safer, but hence less effective than the model the FDA has approved disrupts the federal scheme.” Riegel, 552 U.S. at 325; see also In re Medtronic, Inc., Sprint Fidelis Leads Products Liability Litig., 623 F.3d 1200, 1206 (8th Cir. 2010) (affirming dismissal of design defect claims as preempted because “these are not parallel claims . . . [but r]ather they are attacks on the risk/benefit analysis that led the FDA to approve an inherently dangerous Class III device. Such claims are expressly preempted by § 360k.”); Banet v. Cooper Companies, Inc., Civil Action No. 4:24-cv-029-RGH, 2025 WL 2810675, at *12 (W.D. Ky. Sept. 30, 2025) (dismissing design defect claim under

Kentucky law for a Class III medical device because "any design defect claims based on alleged defects in the design approved by the FDA are expressly preempted"); Bulox v. CooperSurgical, Inc., 773 F. Supp.3d 351, 361 (S.D. Tex. 2025) ("Because Plaintiff's have not alleged that the product in question was designed in violation of federal standards, they have failed to plausibly state a claim for design defect that would avoid preemption under the MDA."); Farson v. CooperSurgical, Inc., Case No. 3:22 CV 716, 2023 WL 5002818, *9 (N.D. Ohio Aug. 4, 2023) (dismissing design defect claim under Ohio law because "application of the Ohio law in this claim takes issue with, rather than mirrors, the federal requirements").

C. Counts Three, Four, and Six: *Negligence, Gross Negligence, and Negligent Misreprentation*

In West Virginia, "[t]o prevail on a claim of negligence, [a plaintiff] must show that defendants '[1] owed the plaintiff some duty of care; [2] that by some act or omission the defendant breached that duty; [3] and that the act or omission proximately caused some injury to the plaintiff [4] that is compensable by damages." City of Charleston, West Virginia v. Joint Commission, 473 F. Supp.3d 596, 615 (S.D.W. Va. 2020) (quoting Hersh v. E-T Enterprises, Ltd. P'ship., 752 S.E.2d 336, 341 (W. Va. 2013), superseded by statutes on other grounds as

stated in Tug Valley Pharmacy, LLC v. All Plaintiffs Below in Mingo Cty., 773 S.E.2d 627 (2015) (Copenhaver, J.). "Ordinary negligence and gross negligence generally involve the same basic elements, differing only in the degree of actionable inattention on the defendant's part." Id. at 625.

In West Virginia, negligent misrepresentation can be established where a person "'under a duty to give information to another, [ ] makes an erroneous statement when he has no knowledge on the subject, and thereby misleads the other to his injury[. That person] is as much liable in law as if he had intentionally stated a falsehood.'" Folio v. City of Clarksburg, 655 S.E.2d 143, 151 (W. Va. 2007) (quoting Syllabus Pt. 1, James v. Piggott, 74 S.E. 667 (W. Va. 1910)); Covol Fuels No. 4 v. Pinnacle Min. Co., LLC, 785 F.3d 104, 115 n.16 (4th Cir. 2015) ("Negligent misrepresentation . . . can be established where a person under a duty to give information to another . . . makes an erroneous statement when he has no knowledge on the subject, and thereby misleads the other to his injury.") (internal quotation and citation omitted).

The court reads Counts Three, Four, and Six as alleging that, in their marketing, advertising, and promotion of the Lap-Band®, defendants made material misrepresentations regarding the product's safety. Insofar as those claims rest on a failure to

provide adequate warnings, those claims are preempted for the reasons explained earlier. However, to the extent that plaintiff alleges that defendants made affirmative misrepresentations regarding the Lap-Band®, the court finds that such a claim escapes preemption as this juncture. See, e.g., In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implants Products Liability Litig., 300 F. Supp.3d 732, 745 (D. Md. 2018) ("A manufacturer of an FDA approved device does not violate federal regulations by claiming its device is safe. That is exactly what FDA approval means. But when a manufacturer makes other claims about its device as, for example, that it is safer than competing devices, it steps out of the protected zone of FDA-approved warranties and into its ongoing obligation to disseminate truthful and nonmisleading information regarding the device.").

D. Count Five - *West Virginia Consumer Credit and Protection Act Violation*

Count Five alleges that all defendants violated the West Virginia Consumer Credit and Protection Act ("WVCCPA") by: "a) representing that the Lap-Band® device was safe for foreseeable intended uses, when Defendants knew otherwise; b) deceptively marketing, promoting, selling, distributing, advertising, and offering for sale the Lap-Band® device to West Virginia

consumers without properly and sufficiently warning them of the dangers of its use; and c) using defective representations and/or designations surrounding the safety and beneficial usage of the Lap-Band® device." ECF No. 1 at 44. Defendants argue that this claim is subject to dismissal for several reasons. One of those reasons is that such a claim is barred in the context of Class III medical devices by the decision of the West Virginia Supreme Court of Appeals in White v. Wyeth, 705 S.E.2d 828 (W. Va. 2010). The court agrees.

"The WVCCPA was enacted in 1974 and 'is a hybrid of the Uniform Consumer Credit Code and the National Consumer Act and some sections from then-existing West Virginia law.'" White, 705 S.E.2d at 833 (quoting Clendenin Lumber and Supply Co., Inc. v. Carpenter, 305 S.E.2d 332, 336 n.4 (W. Va. 1983). In White, plaintiffs, bringing a class action under the WVCCPA, alleged that the defendants, a pharmaceutical company and its marketing firm, used unfair and deceptive business practices in promoting hormone replacement therapy drugs to doctors and patients. See id. at 830-31. Plaintiffs claimed that the defendants used misleading statements in "advertising, marketing and labeling of the products." Id. at 831. The case came to West Virginia's highest court upon a certified question asking about pleading and proving reliance under the WVCCPA. See id.

In answering the question, the White court, discussed the purpose of the WVCCPA:

> (1) [T]he purpose of this article is to complement the body of federal law governing unfair competition and unfair, deceptive and fraudulent acts or practices in order to protect the public and foster fair and honest competition. It is the intent of the legislature that, in construing this article, the courts be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters. To this end, this article shall be liberally construed so that its beneficial purposes may be served.
>
> (2) It is, however, the further intent of the legislature that this article shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest. . . .

Id. at 836 (quoting W. Va. Code § 46A-6-101). The White court acknowledged "the dual legislative purposes of protecting consumers and promoting sound and fair business practices." Id.; see also Bourne v. Mapother & Mapother, P.S.C., 998 F. Supp.2d 495, 501 (S.D.W. Va. 2014) (quoting State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc., 461 S.E.2d 516, 523 (W. Va. 1995) ("'The purpose of the [WVCCPA] is to protect consumers from unfair, illegal, and deceptive acts or practices by providing an avenue of relief for consumers who would otherwise have difficulty proving their case under a more traditional cause of action.'")).

In answering the certified question, the court found that where the WVCCPA claim is predicated on concealment, suppression, or omissions, a plaintiff proves causation "by presentation of facts showing that the deceptive conduct was the proximate cause of the loss." Id. at 837. Where, however, the WVCCPA claim involves express or affirmative misrepresentations, then a plaintiff must prove that he relied on a misrepresentation in order to satisfy the element of causation. See id.

"Turning to the facts" in the case, the court found "that the private cause of action afforded consumers under West Virginia Code § 46A-6-106(a) does not extend to prescription drug purchases." Id. at 837-38. The court explained, "[p]rescription drug cases are not the type of private causes of action contemplated under the terms and purposes of the WVCCPA because the consumer can not and does not decide what product to purchase." Id. at 838. "'[T]he intervention by a physician in the decision-making process necessitated by his or her exercise of judgment whether or not to prescribe a particular medication protects consumers in ways respecting efficacy that are lacking in advertising campaigns for other products.'" Id. (quoting New Jersey Citizen Action v. Schering-Plough Corp., 842 A.2d 174, 177-78 (N.J. 2003)). The court also noted "that the high degree

of federal regulation of prescriptive drug products attenuates the effect product marketing has on a consumer's prescriptive drug purchasing decision." Id. (citing New Jersey Citizen Action, 842 A.2d at 178).

Plaintiff argues that the West Virginia Supreme Court of Appeals has not extended the White holding to Class III medical devices and that it would not do so. The court disagrees. "White stands for the common-sense proposition that where there is a protective intermediate decision-making buffer[,] the patient-consumer is insulated from the wrongs the WVCCPA seeks to redress." Wamsley v. LifeNet Transplant Services, Inc., Civil Action No. 2:10-cv-00990, 2011 WL 5520245, at *11 (S.D.W. Va. Nov. 10, 2011) (finding "no principled difference between carving out an exception for liability under the WVCCPA for a physician who determines which drug to prescribe and a physician who decides which human blood or tissue products are medically appropriate and safe") (Johnston, J.).

In this case, Branch "was not a consumer who was left to tackle on h[er] own the complex medical decision" of whether to use the Lap-Band® device. Id. Indeed, there was more than one health care provider involved in the decision as plaintiff alleges that she asked her primary care provider for a referral to a specialist. Furthermore, as discussed above, Class III

medical devices are highly regulated by the federal government. Therefore, the policy behind the WVCCPA is not furthered by allowing plaintiff to pursue such a claim in this case. See White, 705 S.E.2d at 838 ("The clear public policy behind [the WVCCPA] is that consumer protection laws were meant to fill a gap by protecting consumers where product safety was not already closely monitored and regulated by the government.").

For all these reasons, plaintiff's WVCCPA claim is dismissed.

E. Count Seven - *Punitive Damages*

Count Seven is asserted as a claim for punitive damages against all defendants. "'West Virginia law does not recognize an independent cause of action for punitive damages.'" Myers v. City of Clendenin, 600 F. Supp.3d 626, 643 (S.D.W. Va. 2022) (quoting Miller v. Carelink Health Plans, Inc., 82 F. Supp.2d 574, 579 n.6 (S.D.W. Va. 2000)); see also Mountain Valley Pipeline, LLC v. Zinn, 924 S.E.2d 418, 425 (W. Va. Ct. App. 2025) ("Under West Virginia law, a separate cause of action for punitive damages does not exist, but such damages may be awarded as damages for independent torts under appropriate circumstances."). Accordingly, Count Seven is dismissed; however, punitive damages remain available as viable relief

associated with the underlying legal claims in this matter if plaintiff can prove her entitlement to them.

F. *Successor Liability*

AbbVie moves to dismiss all claims against it because the complaint fails to allege any specific facts or conduct on its part, other than its acquisition of Allergan in 2020. Covidien and the Medtronic defendants make a similar argument. In response, Branch argues that she has stated a claim against all defendants and that AbbVie and the Medtronic defendants are proper parties under the doctrine of successor liability.

"The law presumes that two separately incorporated businesses are separate entities and that corporations are separate from their shareholders." Oakley v. Coast Professional, Inc., CIVIL ACTION NO. 1:21-00021, 2022 WL 364022, at *4 (S.D.W. Va. Feb. 7, 2022) (quoting S. Elec. Supply Co. v. Raleigh Cty. Nat. Bank, 320 S.E.2d 515, 516 (W. Va. 1984)). As the West Virginia Supreme Court of Appeals has explained, "the corporate form will never be disregarded lightly. The mere showing one corporation is owned by another or that they share common officers is not a sufficient justification for a court to disregard their separate corporate structure." Southern States Co-op v. Dailey, 280 S.E.2d 821, 827 (W. Va. 1981).

Under West Virginia law, "[a] successor corporation can be liable for the debts and obligations of a predecessor corporation if there was an express or implied assumption of liability, if the transaction was fraudulent, or if some element of the transaction was not made in good faith." Syl. pt. 3, Davis v. Celotex Corp., 420 S.E.2d 557 (W. Va. 1992). Against this standard, it is clear plaintiff has not successfully pled a claim of successor liability against AbbVie or the Medtronic defendants.[2]

IV. Conclusion

For all these reasons, defendants' motion to dismiss is **GRANTED** as to: 1) all claims against AbbVie Inc., Medtronic, Inc., and Medtronic USA, Inc.; 2) Counts One, Two, Five, and Seven in their entirety; and 3) Count Three, Four, and Six to the extent discussed herein. The motion to dismiss is **DENIED** in all other respects.

The Clerk is directed to send copies of this Memorandum Opinion and Order to all counsel of record.

IT IS SO **ORDERED** this the 30th day of September, 2026.

ENTER: [signature]

David A. Faber
Senior United States District Judge

---

2 The court agrees with Branch that she has adequately pled specific conduct on the part of Covidien that would withstand a motion to dismiss.